IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JUAN LARA, ) | |
| ) | |
| Plaintiff, ) | Case No. CV07-09-S-EJL |
| ) | |
| vs. ) | **MEMORANDUM DECISION** |
| ) | **AND ORDER** |
| CMS, DR. DAWSON, DR. ) | |
| BLAKESLEE, JOHN LANE, P.A., ) | |
| DR. PARTRIDGE, and TONYA ) | |
| HARRIS, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

Pending before the Court is Defendants' Motion for Summary Judgment (Docket No. 44). Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument. D. Idaho L. R. 7.1. For the reasons that follow, this Court concludes that Plaintiff's medical care was adequate under the Eighth Amendment and that Defendants are entitled to summary judgment.

## BACKGROUND

On January 5, 2007, Plaintiff filed a civil rights complaint alleging that Correctional Medical Services ("CMS") and several individual medical providers violated

**MEMORANDUM DECISION AND ORDER - 1**

the Eighth Amendment by failing to provide adequate medical care.  The Court allowed Plaintiff to proceed against Defendants CMS, Dawson, Blakeslee, Lane, and Harris.  Plaintiff was not allowed to proceed against Defendant Partridge.  *See* Initial Review Order (Docket No. 8).  Defendants CMS, Dawson, Blakeslee, and Harris waived service of process.  To effect service on Defendant Lane, the Court required Plaintiff to provide the Court with Defendant Lane's address by March 9, 2009.  Plaintiff did not do so.  *See Notice Regarding No Service Address for John Lane* (Docket No. 41).  On March 27, 2009, the remaining Defendants (Defendants CMS, Dawson, Blakeslee, and Harris) filed their Motion for Summary Judgment (Docket No. 44).

Before Defendants filed their Motion, Plaintiff moved for a stay, alleging that authorities had misplaced his case file during a transfer between facilities.  Nonetheless, Plaintiff filed a Response on June 9, 2009 (Docket No. 49).  Defendants filed a Reply on June 26, 2009 (Docket No. 50).  Plaintiff later informed the Court that he had been able to reconstruct his legal file with the help of Defendants.  The Court found his stay motion moot and, because Plaintiff did not have his file available when he responded to Defendants' Motion for Summary Judgment, allowed Plaintiff to file a Sur-Reply.  Plaintiff did so on July 29, 2009 (Docket No. 54), and Defendants filed their Reply on August 17, 2009.  The Court has reviewed and considered all of these pleadings in its decision.

**MEMORANDUM DECISION AND ORDER - 2**

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A.  **Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *See id.* at 248.

The moving party bears the initial burden demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence, but may simply point out the absence of evidence to support the non-moving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to

**MEMORANDUM DECISION AND ORDER - 3**

support a jury verdict in his or her favor. *Id.* The non-moving party must go beyond the pleadings and show by affidavits or by discovery or disclosure materials that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 324.

**B.    Section 1983 Standard**

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To state a claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).[1] Section 1983 is "'not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

Plaintiff asserts that Defendants have violated his Eighth Amendment right to have adequate medical care in prison. To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff must show that prison officials' "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*

---

[1] The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

**MEMORANDUM DECISION AND ORDER - 4**

*v. Gamble*, 429 U.S. 97, 106 (1976).  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

> The Ninth Circuit has defined a "serious medical need" in the following ways:
>
>> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (quotation omitted), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Deliberate indifference exists when an official knows of and disregards a serious medical condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).  Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted).

Differences in judgment between an inmate and prison medical personnel

**MEMORANDUM DECISION AND ORDER - 5**

regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, [Plaintiff] must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk'" to Plaintiff's health. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980). A mere delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990). If the defendants are able to show that medical personnel have been "consistently responsive to [the inmate's] medical needs," and there has been no showing that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," summary judgment in favor of the defendants is proper. *Toguchi*, 391 F.3d at 1061.

**C.     Factual Background**

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of the facts, insofar as the version is not contradicted by clear documentary evidence in the record.

**MEMORANDUM DECISION AND ORDER - 6**

Plaintiff is a prisoner in the custody of the Idaho Department of Correction ("IDOC"). Defendant CMS is a private medical provider under contract with the IDOC to provide medical care to prisoners. Defendants Dawson, Blakeslee, and Harris are individual health care professionals employed by CMS.

Plaintiff suffered an on-the-job injury to his right wrist in 2005, before he came into the custody of the IDOC. Plaintiff arrived at Idaho State Correctional Institution ("ISCI") on February 24, 2006. At that time, Plaintiff filled out a Medical History Questionnaire, stating that he was allergic to Aspirin and penicillin. *Affidavit of April Dawson, M.D. in Support of CMS Defendants' Motion for Summary Judgment* (Docket No. 44-4) ("Dawson Affidavit"), Exhibit A at PL 43. Plaintiff also stated he was currently taking 800 milligrams of ibuprofen "on a regular basis." *Id.* At his initial medical evaluation, Plaintiff informed medical staff of his wrist injury, and a physician's assistant referred Plaintiff for follow up care. Plaintiff also received ibuprofen at that time. *Dawson Affidavit* at ¶¶ 10-11.

Plaintiff was next seen by medical staff on March 10, 2006, when he was prescribed Ultram. The medical provider who examined Plaintiff also recommended an off-site evaluation by an orthopedist. Because CMS was awaiting information from worker's compensation, this recommendation was withdrawn. However, another off-site referral was requested two months later on May 23, 2006. *Id.* at ¶ 12.

For his off-site evaluation, Plaintiff went to see Dr. Troy Watkins, a Boise orthopedist, on June 19, 2006. Dr. Watkins diagnosed Plaintiff with mid-carpal

**MEMORANDUM DECISION AND ORDER - 7**

instability of the right wrist, with a scapholunate diastasis[2] and DISI[3] abnormality. Dr. Watkins also noted that Plaintiff's wrist was "quite a serious problem" and that surgery -- either a proximal row carpectomy[4] or a scaphoidectomy and a four corner fusion[5] -- might be necessary. Which type of surgery was required would not be clear until the doctor saw whether Plaintiff's capitolunate cartilage -- the cartilage between the capitate and lunate bones of the wrist -- had been maintained. Dr. Watkins stated he wished to see Plaintiff again. *Id.*, Exhibit A at PL 85-86.

Unfortunately, these findings by Dr. Watkins were not available to CMS medical staff for several months. Medical staff repeatedly requested Dr. Watkins's findings so they could fully evaluate Plaintiff's condition. *Id.*, Exhibit A at PL 18-19, 87. However, Dr. Watkins did not send his findings to the prison until October 2006. *Id.* at ¶ 14. CMS medical staff examined Plaintiff several times in the interim, at one point providing a

---

[2] Diastasis is the "separation of two normally attached bones between which there is no true joint." http://medical-dictionary.thefreedictionary.com/diastasis. Scapholunate diastasis is the separation of the scaphoid bone from the lunate bone, which are found at the base of the wrist. http://www.medterms.com/script/main/art.asp?articlekey=8647.

[3] DISI, or "dorsal intercalated segment instability," is a type of carpal instability in which the lunate bone rotates into dorsiflexion, or the backward bending of a part of the body. http://www.boss.net.au/clinician/studynotes/regwri08.htm; http://medical-dictionary.thefreedictionary.com/dorsiflexion.

[4] A proximal row carpectomy involves the removal of the bones in the proximal row of the wrist in an attempt to eliminate pain but maintain range of motion. http://www.cmki.org/LMHS/Chapters/35-ProximalRowCarpectomy.htm.

[5] A scaphoidectomy with four-corner fusion involves the removal of the scaphoid bone and the fusion of the capitate, lunate, hamate, and triquetrum bones of the wrist. http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2526032/.

**MEMORANDUM DECISION AND ORDER - 8**

wrist splint to Plaintiff.  *Id.* at ¶ 16-17.

On October 4, 2006, P.A. Dietchler evaluated Plaintiff's wrist.  Plaintiff asked P.A. Dietchler to prescribe him narcotics for the pain.  P.A. Dietchler found no indication for narcotics and instead gave Plaintiff ibuprofen.  He also recommended that Plaintiff rest, ice, compress, and elevate his wrist.  Plaintiff refused all of these recommendations, told P.A. Dietchler that this was "bullshit," and stormed out of the examination room.  *Id.* at ¶ 18; Exhibit A at PL 87.

Once Dr. Watkins finally sent his notes of the June 19th examination to ISCI, Dr. Blakeslee submitted a request for another off-site consultation with Dr. Watkins.  Dr. Dawson reviewed the request and found that it was unclear whether Plaintiff needed off-site treatment.  Dr. Dawson recommended treating Plaintiff "conservatively and on-site."  *Id.* at ¶ 19.

Plaintiff was next examined by Dr. Partridge in November, who noted that Plaintiff again sought narcotics.  Dr. Partridge found that narcotics were not medically indicated.  *Id.* at ¶ 20.  Dr. Blakeslee evaluated Plaintiff on December 8, 2009.  She then discussed Plaintiff's case with Dr. Dawson, and both agreed an off-site consultation was necessary because of Plaintiff's continued pain.  Plaintiff was then scheduled to see Dr. Watkins.  *Id.* at ¶ 21.

Dr. Watkins evaluated Plaintiff's wrist on January 22, 2007.  Dr. Watkins determined that Plaintiff required surgery -- again, either a proximal row carpectomy or a scaphoidectomy with four-corner fusion -- and noted that such surgery could be

**MEMORANDUM DECISION AND ORDER - 9**

scheduled "as [sic] the prison's convenience." *Id.* at ¶ 22; Exhibit A at PL 200.  Plaintiff returned to Dr. Watkins on April 2, 2007.  Two weeks later, on April 17, 2007, Dr. Watkins performed a proximal row carpectomy of Plaintiff's right wrist.  *Id.* at ¶24; Exhibit A at PL 204-05.

This surgery did not end Plaintiff's pain, however.  Plaintiff was taken to see Dr. Watkins in May, June, September, October, and November of 2007.  *Id.*, Exhibit A, IDOC 76.  Finally, Dr. Watkins determined that he would have to perform a full wrist fusion on Plaintiff.[6]  That surgery occurred on January 22, 2008.  *Id.* at ¶ 25.

Throughout his treatment for his wrist, Plaintiff has taken several medications for his pain.  Plaintiff's medical records show that, at various times throughout this period, Plaintiff took Ultram,[7] Tylenol, ibuprofen, and Naprosyn or naproxen.[8]  *Id.*, Exhibit A at PL 1-2, 4, 6, 7, 9, 10, 24, and 219; Exhibit A at IDOC 12, 14, and 67.  The record also contains refill requests that Plaintiff made to obtain more medication.  Plaintiff requested refills of his ibuprofen prescriptions on March 16 and March 27, 2006, and a refill of his Tylenol prescription on July 7, 2007.  *Id.*, Exhibit A at PL 144-45; Exhibit A at IDOC 41.

---

[6] A full or total wrist fusion is the fusion of the radius, the carpal bones of the wrist, and the metacarpal bones of the hand so that they form one long bone.  Although this surgery still allows for rotation of the hand, a patient who has had a full wrist fusion can no longer bend the wrist.  http://www.orthogate.org/patient-education/wrist/wrist-fusion.html.

[7] Ultram, generically known as tramadol, "is a narcotic-like pain reliever . . . used to treat moderate to severe pain."  http://www.drugs.com/ultram.html.

[8] Naprosyn, generically known as naproxen, is a nonsteroidal anti-inflammatory drug (NSAID) similar to ibuprofen.  It works by "reducing hormones that cause inflammation and pain in the body."  http://www.drugs.com/naprosyn.html.

**MEMORANDUM DECISION AND ORDER - 10**

**D.     Defendants were not deliberately indifferent to Plaintiff's medical needs.**

Plaintiff underwent at least twelve medical evaluations and examinations from the time he arrived at ISCI in February of 2006 to the first wrist surgery on April 17, 2007. The sheer number of times Plaintiff was examined -- twelve times within fourteen months -- suggests that medical staff were "consistently responsive" to Plaintiff's wrist injury. *Toguchi*, 391 F.3d at 1061. Moreover, Plaintiff received a wrist splint, as well as pain medication throughout the entire period. In less than two years in custody, Plaintiff received two wrist surgeries. Defendants have met their burden of demonstrating that the medical care that Plaintiff received was adequate under Eighth Amendment standards.

The burden now shifts to Plaintiff to raise a genuine issue of fact as to whether Defendants were deliberately indifferent. Plaintiff makes two main arguments. First, Plaintiff claims that Defendants unreasonably delayed his first surgery. *Plaintiff's Response and Objection to Motion for Summary Judgment* (Docket No. 49) ("Plaintiff's Response") at 1. Second, Plaintiff claims that Defendants failed to manage his pain adequately because they consistently prescribed him inappropriate pain medication. *Id.* at 1, 5.

### 1.     Plaintiff's First Wrist Surgery

Dr. Watkins first examined Plaintiff on June 19, 2006. Dr. Watkins determined that surgery might be necessary, but wanted to see Plaintiff again before making a definitive decision. Through no fault of Defendants, CMS did not receive Dr. Watkins findings and recommendations until October 2006. At that time, Dr. Dawson determined

**MEMORANDUM DECISION AND ORDER - 11**

that, before sending Plaintiff back to Dr. Watkins, it was appropriate to exhaust non-surgical options and to treat Plaintiff's injury conservatively. Although Plaintiff refused to comply with the recommendations of medical staff, such as icing and elevating his wrist, medical staff continued to treat Plaintiff and provided him with pain medication. In December of 2007, Drs. Dawson and Blakeslee determined that Plaintiff needed to see Dr. Watkins. Dr. Watkins recommended surgery in January 2007, which he performed in April 2007.

Plaintiff has not submitted any evidence that Defendants' actions during this pre-surgery period were deliberately indifferent. First, Defendants did not cause the initial delay in receiving Dr. Watkins's notes. Second, Plaintiff's belief that an earlier surgery would have been a better treatment than the conservative treatment recommended by Dr. Dawson is simply a difference of opinion, and is not sufficient to establish an Eighth Amendment violation. *Sanchez*, 891 F.2d at 242. There is no evidence that the chosen treatment -- conservative, non-surgical treatment with medication, ice, rest, compression, and elevation -- was "medically unacceptable" or that medical staff consciously disregarded an excessive risk to Plaintiff's health. *Toguchi*, 391 F.3d at 1058. Finally, Dr. Watkins explicitly stated that he would perform the surgery at the prison's convenience, indicating the surgery was not an emergency.

Moreover, a delay in treatment does not constitute deliberate indifference unless it causes serious harm. *Wood*, 900 F.2d at 1335. Plaintiff has pointed to no evidence that having the surgery in April of 2007 caused him any harm. Dr. Watkins's findings and

**MEMORANDUM DECISION AND ORDER - 12**

recommendations at the January 2007 appointment were exactly the same as they were when he first examined Plaintiff in June 2006. At the first appointment, Dr. Watkins stated that it might be necessary to perform either a proximal row carpectomy or a scaphoidectomy and four-corner fusion. At the second appointment, Dr. Watkins again confirmed that Plaintiff required one of these two surgeries. Although Plaintiff states that the conservative treatment caused the eventual surgery to be ineffective, he offers no evidence to support this conclusion. Defendants did not violate the Eighth Amendment by treating Plaintiff conservatively for several months prior to surgery or by scheduling his surgery for April of 2007.

### 2.     Pain Medication

Plaintiff asserts that he has a "long standing and known allergic reaction to Aspirin, Ibuprofen, Naproxsyn [sic], & other NSAIDS." *Plaintiff's Response* at 5 n.1. He also claims that medical staff improperly changed or discontinued medications such as Ultram, Tylenol 3, Narcos, and Vicodin prescribed by other providers. *Id.* Therefore, Plaintiff argues, because Defendants took him off of certain medications, substituting medications to which he is allergic, a genuine issue of material fact precludes summary judgment.

The record contains evidence that Plaintiff was prescribed Ultram, Tylenol, ibuprofen, and naproxen. *Dawson Affidavit*, Exhibit A at PL 1-2, 4, 6, 7, 9, 10, 24, and 219; Exhibit A at IDOC 12, 14, and 67. Of these medications, Plaintiff claims he is allergic to ibuprofen and naproxen.

**MEMORANDUM DECISION AND ORDER - 13**

Plaintiff has not shown that Defendants knew of Plaintiff's allergy to ibuprofen. In fact, the record is clear that Plaintiff had been taking ibuprofen "on a regular basis" when he arrived at ISCI. *Id.*, Exhibit A at PL 43. *See also Plaintiff's Verified Statement of Material Facts in Dispute* ("Plaintiff's Statement of Facts"), Appendix D (Docket No. 49-3). When informing ISCI of his allergies, Plaintiff named *only* Aspirin and penicillin. *Id.* Additionally, Plaintiff requested refills of his ibuprofen during the time period at issue. *Dawson Affidavit*, Exhibit A at PL 144-45. There is no evidence that Defendants had any idea Plaintiff was allergic to ibuprofen. Defendants could hardly be expected to know of an allergy if Plaintiff did not inform them of it.

Plaintiff has also submitted a document from his medical files noting that, in addition to Aspirin and penicillin, Plaintiff is allergic to naproxen. *Plaintiff's Statement of Facts*, Appendix H-3 (Docket No. 49-3). The record otherwise contains only one document referencing naproxen. *Dawson Affidavit*, Exhibit A at IDOC 14. On September 24, 2007, a medical provider noted that Plaintiff was then taking naproxen as recommended by his orthopedist. *Id.* Plaintiff's orthopedist was Dr. Watkins. It was Dr. Watkins -- not Defendants -- who decided to give Plaintiff naproxen. Additionally, Plaintiff does not describe his allergic reaction or allege that he suffered any harm from taking naproxen. Without an injury, Plaintiff cannot withstand summary judgment.

Plaintiff's disagreement with Defendants' choice of pain medication is simply that: a disagreement. As such, it is not actionable under § 1983. *Sanchez*, 891 F.2d at 242. Defendants were not required to prescribe Plaintiff narcotics. *See Roth v. Heinzl*, 2009

**MEMORANDUM DECISION AND ORDER - 14**

WL 2432355, *3 (W.D. Wis. Aug. 6, 2009) (granting summary judgment where defendants prescribed non-narcotic painkillers instead of narcotics such as Vicodin).  The choice of which medications to use to treat Plaintiff's pain is a classic example of the exercise of professional medical judgment.  Defendants were not deliberately indifferent in their choices of medication.

## CONCLUSION

Defendants have met their burden of showing they were not deliberately indifferent to Plaintiff's wrist injury.  Defendants made medical decisions about how to treat Plaintiff's injury and which medications to give him.  There is no evidence that Defendants' choice of treatment were medically unacceptable under the circumstances.  Similarly, there is no evidence that Defendants knew of Plaintiff's allergy to ibuprofen, or that Plaintiff suffered any harm from taking naproxen.  Plaintiff's care was at all times consistent with constitutional standards.  Therefore, the Court will grant Defendants' Motion and dismiss the Complaint.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Docket No. 44) is GRANTED.

IT IS FURTHER HEREBY ORDERED that Plaintiff's Complaint (Docket No. 3) is DISMISSED with prejudice.

IT IS FURTHER HEREBY ORDERED that Plaintiff's Motion to Stay Proceedings (Docket No. 57) is MOOT.

DATED: **October 20, 2009**

*Edward J. Lodge*
~~Honora~~ble Edward J. Lodge
U. S. District Judge

**MEMORANDUM DECISION AND ORDER - 16**